EXECUTION VERSION

## AGREEMENT OF SALE

**THIS AGREEMENT OF SALE** is made this 28th day of March, 2016 by and between A. L. Eastmond & Sons, Inc. ("*Seller*"), as debtor and debtor-in-possession in a case under chapter 11 of Title 11 of the United States Code (the "*Bankruptcy Code*"), and AFP SEVENTY EIGHT CORP., having an address at 9 Park Place, 4th Floor, Great Neck, NY 11021 ("*Purchaser*"); Seller and Purchaser sometimes together referred to as the "*Parties*".

### WITNESSETH:

**WHEREAS**, Seller is a debtor and debtor-in-possession in a chapter 11 bankruptcy case entitled *In re A. L. Eastmond & Sons, Inc., et al.*, Case No. 15-13214 (SHL), ("*Bankruptcy Case*") pending before the United States Bankruptcy Court for the Southern District of New York (the "*Bankruptcy Court*"); and

**WHEREAS**, the bankruptcy estate of Seller is the fee title owner of those industrial warehouse buildings bearing street addresses of **1200 Oak Point Avenue, Hunts Point, Bronx New York, a/k/a 448 Tiffany Street** and **437 Casanova Street, Hunts Point, Bronx, New York** as more particularly described in Exhibit "A" attached to this Agreement (collectively, the "*Premises*"); and

**WHEREAS**, Seller desires to sell to Purchaser and Purchaser agrees to purchase from Seller the Premises on the terms and subject to the conditions of this Agreement; and

**WHEREAS,** this Agreement is subject in all respects to the review and approval of the Bankruptcy Court; and

**WHEREAS, the Parties agree that the recitals set forth above and below are integral and material portions of this Agreement;**

**NOW, THEREFORE**, Seller and Purchaser, being legally bound and authorized, **DO HEREBY AGREE AS FOLLOWS**:

1.    **DEFINITIONS.**  For purposes of this Agreement, the following words and terms shall have the meanings specified in this Section 1:

(a)    "*363 Motion*" has the meaning assigned to it in Section 3.1.

(b)    "*Agreement*" means when fully executed by Seller and Purchaser, this Agreement of Sale, together with all Exhibits annexed hereto.

(c)    "*Auction*" has the meaning assigned to it in Section 3.1.

(d)    "*Back-Up Bidder*" has the meaning assigned to it in the Bid Procedures Order or the procedures approved thereby.

(e)    "*Bankruptcy Case*" has the meaning assigned to it in the recitals hereto.

(f) "*Bankruptcy Code*" has the meaning assigned to it in the Preamble.

(g) "*Bankruptcy Court*" has the meaning assigned to it in the recitals hereto.

(h) "*Bankruptcy Rules*" has the meaning assigned to it in Section 3.2.

(i) "*Bid Procedures Order*" has the meaning assigned to it in Section 3.1.

(j) "*Break-up Fee*" has the meaning assigned to it in Section 3.6.

(k) "*Broker*" means, collectively, Keen-Summit Capital Partners LLC and Keller Williams Realty NYC Group.

(l) "*Business Day*" means any day that is not a Saturday, Sunday or federal or state holiday in the state of New York, United States. Should any deadline set forth herein for any action fall on a day that is not a Business Day, such deadline shall be automatically extended to the next day that is a Business Day.

(m) "*Clean Water Act*" has the meaning assigned to it in Section 6.

(n) "*Closing*" has the meaning assigned to it in Section 4.1.

(o) "*Closing Date*" means the date and time specified in Section 4.1 of this Agreement on which title to the Premises is conveyed to Purchaser pursuant to this Agreement.

(p) "*Date of this Agreement*" shall mean the date when an original Agreement, fully executed by Seller and Purchaser, together with all Exhibits annexed hereto is received by Purchaser.

(q) "*Deed*" has the meaning assigned to in in Section 10.1(a).

(r) "*Deposit*" has the meaning assigned to it in Section 2.1(a).

(s) "*Escrow Agent*" means Day Pitney LLP.

(t) "*Execution Date*" means the date upon which a fully executed copy of this Agreement has been delivered to both Seller and Purchaser.

(u) "*Liens*" means, without limitation, all known and unknown liens, claims, liabilities, encumbrances, agreements and interests, whether of record or not of record, of every nature, kind and description, including, but not limited to, loans, union claims, pension claims, judgments, trade accounts payable balances, overages, factoring, intercompany financial liabilities, guarantees, leases, contingencies, personal liability, products liability, litigation claims and successor liability.

(v) "*Minimum Overbid*" has the meaning assigned to it in Section 3.1.

(w) "*Permitted Exceptions*" has the meaning assigned to it in Section 5.1.

(x) "*Plan*" has the meaning assigned to it in Section 3.1.

(y) "*Premises*" has the meaning assigned to it in the recitals hereto.

(z) "*Purchase Price*" has the meaning assigned to it in Section 2.1.

(aa) "*Purchaser*" has the meaning assigned to it in the Preamble.

(bb) "*Sale Order*" has the meaning assigned to it in <u>Section 3.1</u>.

(cc) "*Secured Lender*" means CCHP, LLC, as Seller's pre-petition secured lender, with respect to its right to credit bid for the Property under Section 363(k) of the Bankruptcy Code.

(dd) "*Seller*" has the meaning assigned to it in the Preamble.

(ee) "*Successful Bidder*" has the meaning assigned to it in the Bid Procedures Order or the procedures approved thereby.

(ff) "*Title Company*" means Commonwealth Land Title Insurance Company or such company licensed in the State of New York chosen by Purchaser.

## 2.    PURCHASE PRICE, ESCROW OF DEPOSIT.

**2.1    Payment of Purchase Price.**  The Purchase Price for the Premises (the "*Purchase Price*") shall be the sum of SEVEN MILLION ($7,000,000) DOLLARS.  The Purchase Price shall be paid as follows:

(a)    Simultaneously upon the execution and delivery of this Agreement by the parties, Purchaser shall deposit with the Escrow Agent by a bank wire transfer of immediately available federal funds to an escrow account maintained by Escrow Agent or by official bank check the sum of SEVEN HUNDRED THOUSAND ($700,000.00) DOLLARS (the "*Deposit*"), subject to collection.  The Deposit which shall be maintained in an interest bearing account, with interest following principal shall be held by Escrow Agent in accordance with the terms and conditions of <u>Section 2.2</u>.   The escrow depository is Bank of America, 1 Atlantic Street, Stamford CT 06901.

(b)    The balance of the Purchase Price SIX MILLION THREE HUNDRED THOUSAND ($6,300,000) DOLLARS,  as adjusted by prorations and credits, including Deposit escrow accrued interest, shall be paid by Purchaser on the Closing Date by wire transfer of immediately available federal funds to an account or accounts designated in writing by Seller.

**2.2    Escrow of Deposit.**

(a)    The Deposit shall be delivered to the Escrow Agent.  The Escrow Agent shall hold the proceeds thereof in escrow in an insured interest-bearing bank account (or as otherwise agreed in writing by Seller, Purchaser and the Escrow Agent) until the Closing or earlier termination of this Agreement and shall pay over or apply the Deposit and interest in accordance with the terms of this Agreement.  At the Closing, the Escrow Agent shall pay the Deposit or apply the Deposit in accordance with the terms of this Agreement.  All references to Deposit shall include interest earned thereon.  If for any reason the Closing does not occur and either party makes a written demand upon the Escrow Agent for payment of the Deposit, the Escrow Agent shall give written notice to the other party of such demand.  If the Escrow Agent

does not receive a written objection from the other party to the proposed payment within five (5) Business Days after the giving of such notice, the Escrow Agent is hereby authorized to make such payment. If the Escrow Agent does receive a written objection within such five (5)-Business Day period or if for any other reason the Escrow Agent in good faith shall elect not to make such payment, the Escrow Agent shall continue to hold the Deposit until otherwise directed by written instructions from Seller and Purchaser or a final judgment of a court. The Escrow Agent shall, however, have the right at any time to deposit the Deposit with a Clerk of the Bankruptcy Court, giving written notice of such deposit to Seller and Purchaser. Upon such deposit the Escrow Agent shall be relieved and discharged of all further obligations and responsibilities hereunder, after transfer to the Clerk except with respect to the Escrow Agent's gross negligence, bad faith or willful disregard of this Agreement.

(b)    The parties acknowledge that the Escrow Agent is acting solely as a stake holder at their request and for their convenience, and the Escrow Agent shall not be liable to either of the parties for any act or omission on its part unless taken or suffered in bad faith, in willful disregard of this Agreement or involving gross negligence. Defaulting party shall indemnify and hold the Escrow Agent harmless from and against all costs, claims and expenses, including reasonable counsel fees, incurred in connection with performance of the Escrow Agent's duties hereunder, except with respect to actions or omissions taken or suffered by the Escrow Agent in bad faith, in willful disregard of this Agreement or involving gross negligence on its part. The Escrow Agent has acknowledged acceptance of these provisions by signing in the place indicated on the signature page of this Agreement.

(c)    Purchaser acknowledges that Escrow Agent is also acting as counsel for Seller in connection with the sale of the Premises, and Purchaser acknowledges that it is aware of the potential for actual or apparent conflict of interest which may arise in connection with such representation and Escrow Agent's performance of its duties hereunder. Purchaser hereby waives all rights to object to such conflict of interest and releases Escrow Agent from any liability in connection with such conflict of interest, although not from liability for default under this Agreement. Purchaser hereby consents to Escrow Agent's continuing representation of Seller in all matters relating to the sale of the Premises, expressly including any dispute relating to this Agreement.

## 3.    **BANKRUPTCY COURT MATTERS.**

**3.1    363 Motion or Plan**. Seller agrees that as promptly as practicable after the date hereof, but in no event later than three (3) Business Days after the Execution Date, Seller shall file with the Bankruptcy Court a motion reasonably acceptable to Purchaser (the "*363 Motion*") or a chapter 11 plan of reorganization in the Bankruptcy Case (the "*Plan*"), in either case seeking an order that approves this Agreement (which may be an order confirming the Plan) (the "*Sale Order*")  and an order (the "*Bid Procedures Order*") that (a) establishes the required form and extent of notice of the hearing to consider approval of the 363 Motion or this Agreement as necessary to satisfy the Bankruptcy Court that good and sufficient notice of said hearing is accomplished; (c) establishes the minimum qualifications and requirements for any person who wishes to make a competitive offer for the Premises; (d) establishes and approves the bidding procedures to be followed in the event an auction sale (the "*Auction*") is to be held to

-4-

consider a competitive offer for the Premises by any qualified person, including, without limitation, (i) that to be deemed a qualified bid at the Auction, the aggregate consideration proposed by such competing bid must equal or exceed $7,325,000.00 (the "*Minimum Overbid*"); (ii) that the minimum increment for any subsequent bid shall be at least $100,000.00 in excess of the Minimum Overbid; and (iii) that the minimum increment for any bid thereafter shall be at least $50,000.00 in excess of the previous bid; and (e) approves the Break-Up Fee and Expense Reimbursement upon the terms and conditions set forth in Sections 3.5(b)(v) and 3.6 below.

**3.2** **Notice and Deadlines.** Seller shall promptly file all pleadings with the Bankruptcy Court as necessary or appropriate to seek entry of the Sale Order and the Bid Procedures Order and shall provide timely notice to creditors and all other parties entitled to notice of such pleadings under applicable requirements, including the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*"). Seller shall (a) obtain entry of the Bid Procedures Order within fifteen (15) days after the date of filing of the 363 Motion or Plan and (b) obtain entry of the Sale Order within sixty (60) days after the Execution Date. Purchaser shall promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Bid Procedures Order and Sale Order, including without limitation, furnishing affidavits, financial information or other documents or information for filing with the Bankruptcy Court (subject to confidentiality protections, as may be appropriate) and making Purchaser's employees and representatives available to testify before the Bankruptcy Court.

**3.3** **Appeals of Bankruptcy Orders**. If, following the Closing, any of the Bid Procedures Order and Sale Order shall be appealed by any person (or a petition for certiorari or motion for rehearing, reconsideration or argument shall be filed with respect thereto), Seller and Purchaser, exclusively at their option and expense, may but are not obligated to, take all reasonable steps as may be necessary to defend against such appeal, petition or motion, and endeavor to obtain an expedited resolution of same. An appeal (or petition for certiorari or motion for rehearing, reconsideration or argument) of the Bid Procedures Order or Sale Order shall not delay or stay the Closing, except if and to the extent that such order has been stayed by the Bankruptcy Court. Notwithstanding anything set forth herein to the contrary, Purchaser reserves the right to cancel this Agreement and obtain a refund of its Deposit at any time on or after August 30, 2016 if the Closing has not occurred as a result of a stay and appeal pending as of such date.

**3.4** **Competing Offers**. This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or otherwise better competing bids in accordance with the Bid Procedures Order. If one or more Qualified Bids (as defined in the Bid Procedures Order) is received prior to the expiration of the Bid Deadline (as defined in the Bid Procedures Order), Seller shall conduct an open Auction of the Premises in accordance with the Bid Procedures Order, at which Purchaser shall be permitted to credit bid the Break-Up Fee. At least two (2) Business Days before the Auction, Purchaser shall be notified and provided copies of the Qualified Bids, and Purchaser shall be given the reasonable opportunity to increase its bid to provide the highest or otherwise best offer for the Premises, provided that every bid submitted by Purchaser is a binding bid in accordance with the Bid Procedures Order.

After the entry of the Bid Procedures Order (which shall not be stayed or appealed), Seller shall be permitted to cause its representatives and agents to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by any person (in addition to Purchaser and its affiliates, agents and representatives) in connection with any sale or other disposition of all or any part of the Premises, so long as Seller does not take any action to encourage the withdrawal of Purchaser's bid.

**3.5**      **Additional Closing Conditions**.   In addition to the conditions set forth in <u>Section 9</u> hereof, the obligations of the parties to consummate the Closing are conditioned upon:

(a)   the entry by the Bankruptcy Court of an order confirming the Plan, if such approval is not contained in the Sale Order; and

(b)   the entry by the Bankruptcy Court of the Sale Order, which shall not be stayed, not later than sixty (60) days after the Execution Date (unless extended by mutual consent of the Seller and Purchaser), in form and substance mutually acceptable to Seller and Purchaser:

(i)   approving this Agreement and the transactions contemplated herein and finding that this Agreement and the transactions contemplated herein are fair and reasonable and constitute exchanges of fair consideration and reasonably equivalent value under the Bankruptcy Rules and under the laws of the United States and any state, territory or possession thereof;

(ii)   finding that (w) notice of the hearing concerning approval of the transactions contemplated hereby was given in accordance with the Bankruptcy Code and Bankruptcy Rules and applicable procedural rules and constitutes adequate notice as is required and appropriate under the particular circumstances in accordance with the Bankruptcy Code and Bankruptcy Rules and any other applicable laws, (x) Seller has the legal power and authority to convey all the rights, title and interest of Seller in and to the Premises, (y) Seller has good and marketable title to or a valid and enforceable interest in all of the Premises and (z) Purchaser is a good faith purchaser entitled to all the protections afforded by Section 363(m) of the Bankruptcy Code;

(iii)   providing for the sale and delivery of the Premises to Purchaser free and clear of any and all Liens (other than Permitted Exceptions) to the fullest extent permitted by 11 U.S.C. § 363(f) and case law interpreting Section 363 of the Bankruptcy Code, with such Liens, if any, to attach to the consideration to be received by Seller in the same priority and subject to the same defenses and avoidability, if any, as before the Closing;

(iv)   finding that Purchaser has not assumed any liabilities of Seller and providing that Purchaser shall not have any liability as a successor of Seller under any theory of law including but not limited to successor liability, alter ego, or piercing the corporate veil; and

(v)   providing that, in the event of a credit bid for the Property by the Secured Lender under Section 363(k) of the Bankruptcy Code, Purchaser shall be entitled to an

allowed administrative expense claim under Sections 503(b) and 507(a)(2) of the Bankruptcy Code senior to all other unsecured claims (including all administrative expense claims) against Seller in the Bankruptcy Case in the amount of (i) the Break-Up Fee, plus (ii) the Expense Reimbursement, payable at Closing from the Secured Lender's Cash Collateral (as defined in Section 363 of the Bankruptcy Code) or, if such Cash Collateral is insufficient for such purpose, directly by the Secured Lender.

Purchaser acknowledges that Seller does not guarantee the satisfaction of the conditions precedent listed in this Section 3.5 and that Seller's failure to satisfy such conditions shall not be deemed to be a default hereunder but rather, same shall merely be a failure of a condition to Closing, in which event Purchaser's sole remedy shall be to (i) waive such condition(s) and proceed to Closing, or (ii) terminate this Agreement and receive a full refund of the Deposit and title related expenses; provided, however, Seller shall be permitted to adjourn the Closing Date for a period of up to thirty (30) days in order to satisfy any condition precedent that has not been satisfied.

3.6    **Break-Up Fee and Expense Reimbursement**.   Pursuant to Section 3.1 above, Seller shall seek the Bankruptcy Court's approval at the hearing seeking approval of the Bid Procedures Order of (a) the payment to Purchaser of (x) a break-up fee in an amount equal to Two and One-Half Percent (2.5%) of the Purchase Price equal to $175,000.00  (the "*Break-Up Fee*") plus (y) actual out-of-pocket costs and expenses for attorneys' fees, consultants' fees and other expenses related to the sale and purchase in an aggregate amount not to exceed $50,000.00 (the "*Expense Reimbursement*") and (b) the terms for payment of the Break-Up Fee and Expense Reimbursement set forth in this Section 3.6 and Section 3.5(b)(v). If the Bankruptcy Court declines to approve the Break-Up Fee or Expense Reimbursement upon the terms set forth in this Section 3.6 and Section 3.5(b)(v), then Purchaser may terminate this Agreement, without liability, on written notice delivered to the other party prior to the expiration of three (3) business days of the date the Bid Procedures Order is entered and promptly receive in return the Deposit and interest therein provided in this Agreement.

In the event that Seller does not consummate the transaction contemplated by this Agreement with Purchaser by reason of Seller's acceptance or selection, and the Bankruptcy Court's approval, of a competing bid for the Premises (provided the Purchaser is not in default of this Agreement), Seller shall refund the Deposit and, in consideration for Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof, Purchaser shall be entitled to the Break-Up Fee and Expense Reimbursement. The Break-Up Fee and Expense Reimbursement shall be promptly due and payable to Purchaser immediately upon the earlier of (a) closing of a transaction resulting from a competing bid (including a credit bid by the Secured Lender, in which case the Break-Up Fee and Expense Reimbursement shall be paid out of  Cash Collateral) for the Premises or otherwise directly by the Secured Lender and (b) the forfeiting of the deposit of a competing bidder whose bid was accepted by Seller in accordance with the procedures set forth in the Bid Procedures Order.

Notwithstanding the foregoing, in the event Purchaser is selected as the Back-up Bidder in accordance with the procedures set forth in the Bid Procedures Order, Seller shall hold the Deposit in escrow and shall refund the Deposit to Purchaser within five (5) Business Days

following the earliest of (a) the closing with the successful competing bidder, (b) the date that is twenty-one (21) days after entry of an order by the Bankruptcy Court approving the sale to the successful competing bidder (unless such order has been stayed or appealed, in which case the Deposit shall be held until the expiration of such stay or resolution of such appeal) and (c) June 30, 2016; provided, however, that if the closing of the sale to the successful competing bidder does not occur due to a default by the successful competing bidder, Purchaser shall be deemed to be the Successful Bidder, and the Closing shall promptly occur with respect to Seller and Purchaser, and the Deposit shall be applied to the Purchase Price at Closing.

Seller acknowledges and agrees that (1) payment of the Break-Up Fee and Expense Reimbursement and establishment of the Minimum Overbid as set forth herein and in the Bid Procedures Order are reasonable and are material inducements to the Purchaser to enter into the transaction contemplated by this Agreement and an integral part of the transaction contemplated by this Agreement and (2) Purchaser would not have entered into this Agreement absent, among other terms of this Agreement, the Break-Up Fee and Expense Reimbursement and Minimum Overbid provisions set forth herein and in the Bid Procedures Order.

## 4.    **CLOSING**.

**4.1    Closing Date.**    Subject to the satisfaction or waiver of all conditions precedent with respect to each party's obligations, the closing (the "*Closing*") of the sale and purchase contemplated herein shall occur at the offices of the Escrow Agent on a day and at a time which is not more than twenty-one (21) days after the Bankruptcy Court enters the Sale Order, which has not been stayed (or, if the Sale Order has been stayed or appealed, twenty-one (21) days following the expiration of the stay or resolution of the appeal), but in no event later than June 30, 2016 (the "*Closing Date*") and TIME SHALL BE OF THE ESSENCE, subject to a ten (10) Business Day grace period, such period being a ***final*** time of the essence date, with respect to Purchaser's and Seller's obligation to close on the Closing Date.

## 5.    **TITLE MATTERS**.

**5.1    Condition to Title.**    The Premises shall be sold and conveyed, and Purchaser shall purchase the Premises, free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code, with such Liens to attach to the consideration to be received by Seller in the same priority and subject to the same defenses and avoidability, if any, as before the Closing, subject to: (a) the terms and conditions of the Sale Order, (b) such title exceptions affecting the Premises as the Title Company or any other reputable title insurance company licensed to do business in the State of New York shall, at regular rates, be willing to (i) omit as exceptions to coverage, and (c) those matters listed in Exhibit "A-1"  to this Agreement (collectively, the "*Permitted Exceptions*"). Seller and Purchaser hereby expressly agree that the state of title set forth in the Sale Order and Exhibit "A-1" hereto, including the Permitted Exceptions, reflect good, marketable, insurable and acceptable title to the Premises, to the extent the Title Company issues a title policy consistent with such standards.

    **5.2**    **Title Commitment.**  Purchaser is in receipt of a current Commitment for Title Insurance No. NY 150593 issued by the Title Company and committing to issue the title policy for the Premises.

    **6.**    **CONDITION OF THE PREMISES.**

    **(a)**    **Purchaser is a sophisticated investor and Purchaser's decision to purchase the Premises is based upon its independent expert evaluations of such facts and materials deemed relevant to Purchaser and its agents.  In entering into this Agreement and consummating the transactions contemplated hereunder, Purchaser has not relied upon any oral or written information from Seller or any of Seller's agents, consultants, advisors or representatives, except for Seller's representations and warranties expressly set forth in this Agreement.  Without limiting the generality of the foregoing, except as otherwise expressly set forth in this Agreement, PURCHASER ACKNOWLEDGES AND AGREES WITH SELLER THAT PURCHASER IS PURCHASING THE PREMISES PURSUANT TO THE TERMS OF THIS AGREEMENT AND IN "AS IS", "WHERE IS" AND "WITH ALL FAULTS" CONDITION ON THE EXECUTION DATE (SUBJECT TO THE TERMS OF SECTION (b) BELOW) AND ORDINARY WEAR AND TEAR FROM CONTRACT TO CLOSING, AND INCLUDING EVERYTHING NOTED IN THE PROPERTY CONDITION ASSESSMENT REPORT DATED SEPTEMBER 28, 2015 BY AEI CONSULTANTS, TOGETHER WITH ANY LATENT DEFECT OR NON-DISCOVERABLE DEFECT, SPECIFICALLY AND EXPRESSLY WITHOUT ANY WARRANTIES, REPRESENTATIONS OR GUARANTEES, EITHER EXPRESS OR IMPLIED OF ANY KIND, NATURE, OR TYPE WHATSOEVER FROM OR ON BEHALF OF SELLER AND SELLER DISCLAIMS AND PURCHASER WAIVES, RELEASES AND DISCHARGES SELLER FROM ANY AND ALL WARRANTIES, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR AS TO ANY ENVIRONMENTAL MATTERS EXCEPT TO THE EXTENT EXPRESSLY OTHERWISE PROVIDED UNDER THIS AGREEMENT.  Purchaser agrees that its covenants, agreements and obligations under this Agreement shall not be excused or affected by (i) the physical condition of the Premises, the physical condition or operation of the improvements or personal property, or the fitness, merchantability or suitability of the Premises for any use or purpose, (ii) the compliance or non-compliance with any laws, codes, ordinances, rules or regulations of any governmental authority, or by any violations thereof, (iii) the environmental condition of the Premises or the Premises' compliance or non-compliance with any laws, code, ordinances, rules or regulations of any governmental authority relating to the presence, use, storage, handling or removal of any Hazardous Substances (defined below), (iv) engineering controls, institutional controls, environmental covenants and deed restrictions implemented to address the presence of Hazardous Substances and for the remediation of the Premises to non-residential standards, (v) the current or future use of the Premises, including, but not limited to Purchaser's intended uses of the Premises, (vi) the current or future real estate tax liability, assessment or valuation of the Premises, (vii) the availability or non-availability of any benefits conferred by federal, state or municipal laws, whether for subsidies, special real estate tax treatment or other benefits of any kind, (viii) the availability or unavailability of any licenses, permits, approvals or**

certificates which may be required in connection with the operation of the Premises, (ix) the compliance or non-compliance of the Premises, in its current or any future state, with applicable zoning ordinances and the ability to obtain a change in the zoning or a variance with respect to the Premises' non-compliance, if any, with any zoning ordinances, or (x) the actual or projected revenue and expenses of the Premises except as otherwise expressly provided in this Agreement. Seller is not liable or bound in any manner by any oral or written statements, representations, real estate brokers, "set-ups," offering memoranda or information pertaining to the Premises furnished by any real estate broker, advisor, consultant, agent, employee, representative or other person. For the purposes of this Agreement, "Hazardous Substances" means: (w) those substances included within the definitions of any one or more of the terms "hazardous substances," "hazardous materials," "toxic substances," and "hazardous waste" in the Comprehensive Environmental, Response, Compensation and Liability Act, as amended, 42 U.S.C. §§9601 and 9657 et seq., the Resource Conservation and Recovery Act of 1976, as amended, 42 U.S.C. §6901 et seq., and the Hazardous Materials Transportation Act, as amended, 49 U.S.C. Sections 1801 et seq. and in the regulations promulgated pursuant to such laws; and (x) such other substances, materials and wastes as are regulated under applicable environmental laws or which are classified as hazardous or toxic under environmental laws; (y) any materials, wastes or substances that are (1) petroleum or in whole or in part derived from petroleum; (2) asbestos or asbestos-containing materials; (3) polychlorinated biphenyls; (4) designed as a "hazardous substance" pursuant to section 311 of the Clean Water Act, as amended, 13 U.S.C. §1321 et seq. (33 U.S.C. §1321) (the "*Clean Water Act*") or designated as "toxic pollutants" pursuant to §307 of the Clean Water Act (33 U.S.C. §1317); (5) flammable explosives; or (6) radioactive materials; and (z) degradation products of any of the foregoing. Nevertheless, the Parties agree that documents actually provided by Seller or its agents to Purchaser are true and complete copies.

**(b) In the event of casualty, damage or partial destruction of the Premises occurring after the Execution Date requiring an amount exceeding $500,000.00 to restore and rebuild such damaged or destroyed portion, Purchaser reserves the right to cancel the Agreement and obtain return of the Deposit and interest. If such damage or destruction is up to $500,000.00, Purchaser shall be entitled, at its election, to either an assignment of insurance coverage in an amount equal to the actual commercially recognizable costs (pursuant to construction industry standards) to fully repair or replace necessary damage or the destroyed portion of the building, or a credit against the Purchase Price for the quantified extent of damage or destruction up to the $500,000.00 limit.**

## 7.    ACCESS FOR INSPECTIONS.

**7.1**    Purchaser reserves the right to request access to the Premises from time to time and at any time prior to Closing for the purpose of inspecting the Premises upon not less than three (3) Business Days' prior written notice to Seller. Seller shall provide Purchaser with reasonable access to Seller's books and records at normal business hours upon reasonable prior notice. All access taken by Purchaser pursuant to the provisions of this Section 7 shall be in accordance with all the laws, rules and regulations applicable thereto and subject to the terms and conditions of this Agreement. Purchaser hereby agrees to indemnify and hold Seller

harmless from any and all Liens, loss, damage, penalties, liabilities or claims arising from Purchaser's exercise of the rights herein granted, including, but not limited to attorney's fees and costs.

      **7.2**    Prior to any access or entry, Purchaser shall maintain, at Purchaser's sole cost, and shall require any contractor, consultant or agent Purchaser may engage to maintain, at all times as required in this Agreement, the insurance coverage set forth below with good and solvent insurance companies licensed to do business in New York State with full policy limits applying, but not less than as set forth below:

      (a)    Workers' Compensation Insurance as required by laws and regulations applicable to and covering employees of Purchaser, its contractors, consultants or agents;

      (b)    Commercial General Liability Insurance with a broad form contractual liability endorsement and with a combined single limit of not less than Two Million and No/100 Dollars ($2,000,000.00) per occurrence for bodily injury and property damage and an excess umbrella liability policy for bodily injury and property damage in the amount of Five Million and No/100 Dollars ($5,000,000.00); and

      (c)    Business Automobile Liability Insurance covering all vehicles used in the operations of Purchaser with limits of liability of not less than Seven Hundred Fifty Thousand and No/100 Dollars ($750,000.00) combined single limit.

      A certificate naming Seller, its affiliates, successors and assigns as their interests may appear (as advised by Seller to Purchaser), as additional insureds shall be delivered to Seller prior to any entry at the Premises. Such certificate shall provide that any change restricting or reducing coverage or the cancellation of any policies under which certificates are issued shall not be valid as respects the Seller's, or its members', officers', employees', subsidiaries' and affiliates' interest herein until the Seller has received thirty (30) days prior notice in writing of such change or cancellation.

      **7.3**    The rights granted here shall be at Purchaser's sole risk. Seller shall owe no duty, whatsoever, to anyone utilizing such access to either warn or protect against any risk or hazard whether or not Seller has actual or constructive knowledge of same.  During such access, the foregoing personnel shall not cause any interference with the operations of Seller or any other occupant or damage to the Premises. Seller may require that persons granted access to such portion of the building(s) be accompanied by Seller's representative.

      **7.4**    All property inspections and all due diligence are the sole responsibility of Purchaser and any costs associated with same shall be paid for by Purchaser, provided that Seller shall provide Purchaser with such inspections of the Premises and related information in possession of Seller and reasonably requested by Purchaser .

      **8**.    <u>**REPRESENTATIONS.**</u>

Seller and Purchaser do hereby represent and warrant to the other as follows, which representations and warranties shall be true and correct as of the Date of this Agreement and as of the Closing Date:

**8.1**    **Validity**.    This Agreement, once approved by the Bankruptcy Court, constitutes a valid and binding obligation of Seller and Purchaser in accordance with its terms.

**8.2**    **Authority**.    Subject to Bankruptcy Court approval, Seller and Purchaser have the full right and authority to execute this Agreement and fulfil all of the transactions hereby contemplated, subject to the terms and conditions of the Agreement.

**8.3**    **Purchaser Identity**. Purchaser is a wholly-owned subsidiary of United Capital Corp., a Delaware corporation. Notwithstanding the foregoing representation, Seller acknowledges and agrees that United Capital Corp. is not a party hereto and nothing set forth herein shall be deemed to bind United Capital Corp. to any term or provision of this Agreement. Seller hereby waives any and all claims and causes of action it may have against United Capital Corp. arising from or relating to this Agreement or the transactions contemplated hereby.

**9**.    **CONDITIONS TO CLOSING.**

**9.1**    **Purchaser's Condition.**    In addition to the conditions set forth in Section 3.5, the obligation of Purchaser to consummate the transactions contemplated by this Agreement shall be subject to the following conditions: (i) the performance and observance by Seller of all covenants, warranties and agreements of this Agreement to be performed or observed by Seller prior to or on the Closing Date and (ii) the fulfillment on or before the Closing Date of all other conditions precedent to Closing benefiting Purchaser specifically enumerated in this Agreement, any or all of which may be waived in writing by Purchaser in its sole discretion.

**9.2**    **Seller's Condition**. In addition to the conditions set forth in Section 3.5, the obligation of Seller to consummate the transactions contemplated by this Agreement shall be subject to the following conditions: (i) the performance and observance by Purchaser of all material covenants and agreements of this Agreement to be performed or observed by Purchaser prior to or on the Closing Date and (ii) the fulfillment on or before the Closing Date of all conditions precedent to Closing benefiting Seller specifically set forth in this Agreement, any or all of which may be waived by Seller in its sole discretion.

**10**.    **ITEMS TO BE DELIVERED AT CLOSING.**

**10.1**    **Seller's Deliveries**.    At Closing, Seller shall deliver or cause to be delivered to Purchaser the following items executed and acknowledged by Seller, as appropriate:

(a)    A bargain and sale with covenants against grantor's acts deed (the "*Deed*") attached hereto and made a part hereof as Exhibit B.

(b)    Sole and exclusive possession of the Premises, free of any tenancies and any rights of possession, together with all permanent fixtures and installations at the Premises as of February 1, 2016 (as included in the Purchaser Price), and otherwise in vacant, and broom clean condition, with all non-permanent installations, including, but not limited to, the compressor in the yard and the crane located in the high one-story building abutting the yard, and personal property removed. All fixtures and installations to remain in the Premises shall be agreed upon before Closing and set forth on Schedule A attached hereto.

(c)    Deliver to Purchaser such documents in such form as may be reasonably required by the Title Company, including, but not limited to, an Affidavit of Non-Foreign Status (FIRPTA).

(d)    A copy of the Sale Order.

(e)    Such further instruments, agreements or other documents as may be necessary to effectuate the provisions of this Agreement and expressed intent of the Parties.

(f)    The Parties shall inspect the Premises within two (2) Business Days of Closing, to confirm, if such is the case, that its condition conforms to this Agreement's requirements.

    10.2    **Purchaser's Deliveries**. At Closing, Purchaser shall deliver or cause to be delivered to Seller the following items:

(a)    The balance of the Purchase Price as adjusted under this Agreement in accordance with Section 2.1 (b).

(b)    Such further instruments, agreements and other documents as may be necessary to effectuate the provisions of this Agreement as identified by the Title Company, the Bankruptcy Court and the Parties.


    11.    **CLOSING COSTS AND ADJUSTMENTS**.

    11.1    **Closing Costs**. Seller shall seek inclusion of terms in the Sale Order that (a) Seller's sale, transfer, assignment and conveyance of the Premises and other assets transferred hereunder to Purchaser shall be entitled to the protections afforded under Section 1146(c) of the Bankruptcy Code, and (b) directing the clerk of the county in which the Premises is located to accept for recording all instruments delivered in connection with the Closing of the transactions contemplated under this Agreement without the imposition, levying or collection of conveyance, stamp, recording or any similar or related kind of taxes, assessment or required payment of any kind. If such a provision is not included, the Parties shall prepare and cause to be filed transfer tax returns indicating exemption by reason of the conveyance being pursuant to the Sale Order. Although the Parties do not believe transfer taxes are payable, Seller shall be solely responsible for paying any transfer or similar taxes with respect to the Premises due as a result of the transactions provided for in this Agreement not avoided under Section 1146(c) of the

-13-

Bankruptcy Code. The provisions of this Section 11.1 shall survive the Closing or a termination of this Agreement.  Purchaser shall pay (a) the costs of the title insurance premiums for the title policy, and (b) the cost of any title endorsements and affirmative insurance required by Purchaser payable in connection with the conveyance of the Premises. The Seller shall pay recording charges, if any, payable in connection with the conveyance of the Premises.  Except the Expense Reimbursement and as expressly provided in this Agreement, Seller and Purchaser shall pay their respective legal, consulting and other professional fees and expenses incurred in connection with this Agreement and this transaction.

11.2    **Adjustments**.  Adjustments shall be made and paid at the Closing as follows:

(a)    All utility, water and sewer charges (as applicable), real estate taxes and assessments, including any special assessments, assessed against the Premises and all fuel charges shall be satisfied as of Closing or credited to Buyer against the Purchase Price.

12.    **ADDITIONAL AGREEMENTS.**

Purchaser and Seller represent and agree as follows:

12.1    **Condemnation.**  Seller shall provide to Purchaser copies of any notices of Condemnation received by Seller, within seven (7) days of receipt of same. In the event that any material portion of the Premises shall be taken in condemnation or under the right of eminent domain after the Date of this Agreement and before the Closing Date, Purchaser may at its option, either (i) terminate this Agreement or (ii) proceed to Closing under this Agreement and pay the full Purchase Price as set forth in <u>Section 2</u> of this Agreement as applicable, in which latter event, all awards or settlements under any such proceedings, whether or not made prior to Closing, shall become the right and property of Purchaser.  Seller or its designee shall assign to Purchaser any claim or interest therein, and Seller or its designee hereby agrees to execute any documents reasonably required by Purchaser in connection therewith after the Closing.  In the event Purchaser terminates this Agreement hereunder, the Deposit and all interest accrued thereon shall be returned to Purchaser and this Agreement shall have no further force or effect, whatsoever, except for obligations of Purchaser which have previously accrued hereunder.

12.2 **Insurance. Seller.**   Seller shall maintain through Closing of title casualty and liability coverage insuring against claims, injury and property damage in commercially reasonable amounts covering the market and replacement value of the property and liability coverage of a minimum of $5,000,000.00.

12.3.    **Cooperation.**   Seller and Purchaser shall, from time to time, and at Closing, execute and deliver such further instruments as Purchaser or Seller or their counsel or Title Company may reasonably request or require to effectuate the intent of this Agreement and shall otherwise cooperate with each other in furtherance of the purposes of this Agreement.

-14-

## 13.    <u>REMEDIES; TERMINATION.</u>

**13.1**    This sale is a cash sale and is not subject to any financing contingency. Purchaser may not delay the Closing Date or terminate this Agreement due to Purchaser's inability to obtain financing.  If Purchaser fails to close on the Closing Date due to a lack of funds, Purchaser shall be in default of this Agreement and Seller's sole remedy shall be to terminate this Agreement and retain the Deposit made hereunder as liquidated damages.  The parties agree that the actual damages upon the Purchaser's default would be extremely difficult or impractical to ascertain and that the Deposit, which has been negotiated, represents a fair and reasonable amount of damages Seller will sustain if Purchaser defaults under this Agreement and fails to close on the Closing Date.

**13.2**    In the event Purchaser violates or fails to fulfill or perform any of the terms and conditions of this Agreement required to be performed by Purchaser prior to Closing or if Purchaser fails to consummate the acquisition of the Premises as required hereunder, TIME BEING OF THE ESSENCE, subject to a ten (10) Business Day grace period, such period being a ***final*** time of the essence date, with respect to Purchaser's and Seller's obligation to close on the Closing Date. Seller may terminate this Agreement upon written notice to the Purchaser and the Deposit shall be retained by Seller, as the Seller's sole and exclusive remedy, as liquidated damages for such violation or failure, whereupon this Agreement shall become null and void, and neither party shall have any further rights or obligations hereunder, except for such obligations as expressly survive the termination of this Agreement.  The parties agree that the actual damages upon Purchaser's default would be extremely difficult or impractical to ascertain and that the Deposit, which has been negotiated, represents a fair and reasonable amount of damages that Seller will sustain if Purchaser violates or fails to fulfill and perform any of the terms and conditions of this Agreement required to be performed by Purchaser resulting in a failure to close, under the circumstances existing at the time hereof.

**13.3**    In the event Seller violates or fails to fulfill or perform any of the terms and conditions of this Agreement required to be performed by Seller prior to Closing or if Seller fails to consummate the sale of the Premises as required hereunder, Purchaser reserves the right to seek specific performance and reasonable legal fees and expenses incurred therefor or at its election, cancel and terminate this Agreement upon written notice to Seller and the Deposit and interest shall be delivered to Purchaser by the Escrow Agent, as the Purchaser's sole and exclusive remedy, whereupon this Agreement shall become null and void, and neither party shall have any further rights or obligations hereunder, except for such obligations as expressly survive the termination of this Agreement.

**13.4**    Notwithstanding anything to the contrary set forth in this Agreement, in no event shall Seller be liable to Purchaser or to any representatives, agents, affiliates or subsidiaries of Purchaser, for any special, exemplary, indirect or consequential damages, including without limitation any lost profits, loss of business, business interruption, lost savings or other incidental or punitive damages, even if Seller has been advised of the possibility of such damages.

14.    **BROKER.**

Seller represents and warrants to Purchaser that no broker or finder has been engaged by Seller in connection with the sale contemplated under this Agreement other than the Broker.  Seller has entered into a separate agreement with the Broker governing the commission payable hereunder, which shall be paid solely by Seller.  Purchaser represents and warrants to Seller that no broker or finder has been independently engaged by Purchaser in connection with the sale contemplated under this Agreement. The Parties indemnify and hold the other party harmless from and against any loss, liability or expense including, without limitation, reasonable attorneys' fees, by reason of any claim for a real estate sales commission made by any real estate broker or other person alleging relations, conversations or negotiations with it arising out of the transactions contemplated in this Agreement if such claims are based in whole or part in part on dealings or discussions or agreements with the indemnifying party.  Nothing contained herein shall be construed to create any rights in any person or entity as a third-party beneficiary to this Agreement.  The provisions of this Section 14 shall survive the Closing.

15.    **NOTICES.**

No notice, request, consent, approval, waiver or any communications under this Agreement shall be effective unless received, but any such communication shall be deemed to have been given upon receipt of same, if the same is in writing and is sent by hand courier, recognized overnight delivery service, facsimile (followed by postage prepaid regular mail) email (followed by postage prepaid regular mail) or mailed by registered or certified mail return receipt requested, postage prepaid, addressed to the parties at the addresses noted herein below. Copies of all notices shall be provided to each party and the attorney for each party, as applicable, at the respective addresses also noted below:

SELLER:                                        A.L. Eastmond & Sons, Inc.,
                                               Attn: Arlington Leon Eastmond, Jr.
                                               1175 Leggett Avenue
                                               Bronx, New York  10017
                                               Email:  teastmond@easco.com

ADDITIONAL NOTICE TO SELLER:                   Day Pitney LLP
                                               One Canterbury Green
                                               Stamford, CT 06901
                                               Attn: James Carlon, Esq.
                                               Email: jcarlon@daypitney.com

PURCHASER:                                     AFP Seventy Eight Corp.
                                               9 Park Place, 4th Floor
                                               Great Neck, NY  11021
                                               Attn:  Mr. Michael Lamoretti
                                               lamoretti@unitedcapitalcorp.net

ADDITIONAL NOTICE TO PURCHASER:                Meyer, Suozzi, English & Klein, P.C.

990 Stewart Avenue, Suite 300, P.O. Box 9194
Garden City, New York  11530
Attn:  Edward J. LoBello, Esq.
Email:  elobello@msek.com
Abraham B. Krieger, Esq.
Email:  akrieger@msek.com

**16.    APPLICABLE  LAW;  LIMITED  RIGHT  OF  ASSIGNMENT  BY
PURCHASER.**

(a)    This Agreement and the performance hereof shall be governed,
interpreted, construed and regulated by the laws of the State of New York.

(b)    The rights of Purchaser under this Agreement shall not be assigned by
Purchaser without the prior written consent of Seller, except that Purchaser may, on notice to
Seller, assign its rights under this Agreement to an entity in which Purchaser has a majority and
controlling ownership interest and shall continue through Closing to own the majority and
controlling interest and over which Purchaser maintains, and continues to maintain, management
and control through Closing, provided further that Purchaser shall continue to remain liable for
all financial and other obligations of the Purchaser hereunder both as a direct obligor and as a
guarantor of payment to the extent such payment is required under this Agreement.  In enforcing
any obligation of Purchaser hereunder, Seller need not exhaust any other remedy or first pursue
any remedy against any other party or entity, but shall at all times be entitled to seek remedies of
any kind or nature, legal or equitable, against Purchaser or its assignee if such is the case.

(c)    Any prohibited assignment of Purchaser's rights under this Agreement
shall be deemed a breach of this Agreement entitling Seller, at its option to terminate this
Agreement, on notice to Purchaser, and for Seller to retain the entire Deposit and all interest
thereon as liquidated damages.  In that instance, this Agreement shall have no further force or
effect, whatsoever, except for those obligations of Purchaser that have previously accrued
hereunder.

**17.    SEVERABILITY.**

If any term, covenant, condition or provision of this Agreement or the application
thereof to any person or circumstance shall at any time and to any extent be found invalid or
unenforceable, the remainder of this Agreement or the application of such terms and provisions
to persons or circumstances other than those as to which it is held invalid or unenforceable shall
not be affected thereby and each term, covenant, condition and provision of this Agreement shall
be valid and deemed enforceable to the full extent permitted by law.

**18.    INTERPRETATION.**

Wherever herein the singular number is used, the same shall include the plural,
and the masculine gender shall include the feminine and neuter genders, and vice versa, as the
context shall require.  This Agreement may be executed in original or PDF form in several

counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument.

### 19.    SECTION HEADINGS.

The section headings in this Agreement are inserted as a matter of convenience for reference and are not to be given any effect whatsoever in construing any provision of this Agreement.

### 20.    ENTIRE AGREEMENT.

This Agreement sets forth all of the promises, agreements, conditions and understandings between the parties hereto under the subject matter throughout, and there are no promises, agreements, conditions or understandings, either written or oral, either expressed or implied, between them other than as set forth herein.  Except as herein otherwise specifically provided, no subsequent alterations, amendments, changes or additions to this Agreement shall be binding upon either party unless agreed to in writing and signed by each party.

### 21.    RECORDING OF AGREEMENT OR MEMORANDUM PROHIBITED.

Purchaser agrees not to record this Agreement or any memorandum of this Agreement.  If Purchaser breaches its promise, Seller may declare this Agreement in default and terminate same as provided herein.   In that event, Seller shall retain the Deposit and all interest thereon, and this Agreement shall have no further force or effect, whatsoever, except for those obligations of Purchaser that have previously accrued hereunder.

### 22.    PRESENTATION OF THIS AGREEMENT.

This Agreement shall be considered only as an offer to Purchaser and shall not be enforceable against Seller until the same and all of its terms and conditions are approved by both Seller and the Bankruptcy Court on notice to all creditors in accordance with Section 3 of this Agreement above, and this Agreement is executed and delivered by and on behalf of Seller with the receipt of the Deposit by Escrow Agent.

### 23.    NO PRESS RELEASES.

No press release or public statement concerning the transactions contemplated by this Agreement shall be made by either party without the prior written approval of the other, which consent may be withheld by the other party in its sole discretion.  Purchaser acknowledges that the existence of, and the terms and provisions of this Agreement and the information provided to Purchaser by Seller or otherwise obtained by Purchaser in the conduct of any investigations in connection with the transactions contemplated by this Agreement (including, but not limited to, information and material furnished to Purchaser prior to the date hereof), is confidential and proprietary to the Seller and shall be maintained in the strictest of confidence by Purchaser, provided that Purchaser may disclose such matters (i) as may be required, on advice of counsel, pursuant to applicable law or court order after giving Seller prior written notice of Purchaser's intention to disclose such matters and giving Seller a reasonable opportunity to seek a protective

order or other relief; and (ii) to Purchaser's financial advisers and attorneys in connection with the transactions contemplated by this Agreement, provided such financial advisers agree in writing to hold such information in the strictest of confidence on terms not less onerous than the restrictions contained in this provision.

24.    **TIME OF THE ESSENCE.**  Time, wherever specified herein for satisfaction of conditions or performance of obligations by Purchaser and Seller, is of the essence of this Agreement.

25.    **COUNTERPARTS.**  This Agreement may be executed by original or PDF signatures in any number of counterparts, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument.  This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.  The Parties agree that facsimile and PDF copy signatures shall have the same force and effect as original signatures.

26.    **1031 EXCHANGE.**  The Parties shall cooperate with each other at no charge to the other in the event Purchaser elects to effectuate the Closing of title through an IRC 1031 exchange. Purchaser shall reimburse Seller for the reasonable costs incurred in connection with Purchaser's rights under this section.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the parties hereto have hereunto set their hands and seals as of the date first above written.

SELLER:

**A.L. EASTMOND & SONS, INC.**, a New York Corporation

By_____
Name: Arlington Leon Eastmond, Jr.
Title:   Authorized Signatory


PURCHASER:

**AFP SEVENTY EIGHT CORP.**


By: _____
Name:
Title:

Escrow Terms of Section 2.2 Agreed to:

**DAY PITNEY LLP,**
**Escrowee**


By; _____
Name: James Carlon, Esq.
Title: Partner


[SIGNATURE PAGE OF SALE AGREEMENT]

**IN WITNESS WHEREOF**, the parties hereto have hereunto set their hands and seals as of the date first above written.

**SELLER:**

**A.L. EASTMOND & SONS, INC.,** a New York Corporation

By: _____
Name: Arlington Leon Eastmond, Jr.
Title:  Authorized Signatory

**PURCHASER**:

**AFP SEVENTY EIGHT CORP**.

By: _____
Name:  Michael T. Lamoretti
Title:  U. P.

Escrow Terms of Section 2.2 Agreed to:

**DAY PITNEY LLP,**
**Escrowee**

By; _____
Name: James Carlon, Esq.
Title: Partner

[SIGNATURE PAGE OF SALE AGREEMENT]

**IN WITNESS WHEREOF**, the parties hereto have hereunto set their hands and seals as of the date first above written.

SELLER:

**A.L. EASTMOND & SONS, INC.**, a New York Corporation

By: _____
Name: Arlington Leon Eastmond, Jr.
Title:   Authorized Signatory

PURCHASER:

**AFP SEVENTY EIGHT CORP.**

By: _____
Name:
Title:

Escrow Terms of <u>Section 2.2</u> Agreed to:

**DAY PITNEY LLP,**
**Escrowee**

By: _____
Name: James Carlon, Esq.
Title: Partner

[SIGNATURE PAGE OF SALE AGREEMENT]

-20-

# EXHIBIT A

# LEGAL DESCRIPTION

## Parcel No. 1 (Lot 121)

ALL that certain plot, piece or parcel of land, situate, lying and begin in the Borough and County of Bronx, City and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the southerly side of Oak Point Avenue and the easterly side of Tiffany Street as said street and avenue are now legally opened;

RUNNING THENCE easterly along said southerly side of Oak Point Avenue 200 feet to the westerly side of Casanova Street as laid down on the final maps;

THENCE southerly along said westerly side of Casanova Street 132 feet;

THENCE westerly parallel with said southerly side of Oak Point Avenue 200 feet to said easterly side of Tiffany Street;

THENCE northerly along said easterly side of Tiffany Street, 132 feet to the point or place of BEGINNING.

## Parcel No. 2 (Lot 130):

ALL that certain plot, piece or parcel of land, situate, lying and begin in the Borough and County of Bronx, City and State of New York, bounded and described as follows:

BEGINNING at a point on the easterly side of Tiffany Street distant 132 feet southerly from the corner formed by the intersection of the southerly side of Oak Point Avenue and said easterly side of Tiffany Street;

RUNNING THENCE easterly parallel with the southerly side of Oak Point Avenue 200 feet to a point on the westerly side of Casanova Street distant 132 feet southerly from the southerly side of Oak Point Avenue;

THENCE southerly along the westerly side of Casanova Street 125 feet;

THENCE westerly parallel with the southerly side of Oak Point Avenue 200 feet to a point on the easterly side of Tiffany Street 257 feet southerly from the southerly side of Oak Point Avenue;

THENCE northerly along the easterly side of Tiffany Street 125 feet to the point or place of BEGINNING.

A-1-1

# EXHIBIT A-1

## PERMITTED EXCEPTIONS

1. **As to Parcel No. 1 (Lot 121)**

   As shown on a survey made by CND Mapping, Inc., dated 1-5-2007, revision 9-21-2015:

   a.  Projections over Oak Point Avenue by:

   | | |
   |---|---|
   | Camera | 1.2 feet |
   | Light | 3.8 feet |
   | Rollup gate | 1.6 feet |

   b.  Projections over Casanova Street by:

   | | |
   |---|---|
   | Camera | 1.2 feet |
   | Light | 3.5 feet |
   | Rollup gate | 1.6 feet |

   c.  Party wall along part of the southerly line.

   d.  Projections over Tiffany Street by:

   | | |
   |---|---|
   | Camera | 1.6 feet |
   | Light | 3.8 feet |
   | Rollup gate | 1.7 feet |

2. **As to Parcel No. 2 (Lot 130)**

   As shown on a survey made by CND Mapping, Inc., dated 1-9-2007

   a.  Projections over Casanova Street by:

   | | |
   |---|---|
   | Camera | 1.2 feet |
   | Light | 3.5 feet |
   | Rollup gate | 1.6 feet |

   b.  Projections over Tiffany Street by:

   | | |
   |---|---|
   | Camera | 0.9 feet |
   | Rollup gate | 1.8 feet |

   c.  Party wall along part of the northerly line.

A-1-1

3.  Covenants, conditions, easements, agreements of records, etc., as follows;

    a.  Covenants, Restrictions and Reservation for Utility Purposes set forth
       In <u>Liber 366 Cp 150</u> **(as to Lot 121)**, and Liber 366 Cp 152 **(as to Lot 130)**.

4.  Lien of street vault charges, if any.

**EXHIBIT B**

**<u>BARGAIN AND SALE WITH COVENANTS DEED</u>**

Form 8002 (3/00) – Bargain and Sale Deed, with Covenant against Grantor's Acts—Individual or Corporation. (Single sheet)

**CONSULT YOUR LAWYER BEFORE SIGNING THIS INSTRUMENT – THIS INSTRUMENT SHOULD BE USED BY LAWYERS ONLY.**

---

**THIS INDENTURE,** made the        day of        ,        and
**BETWEEN**




party of the first part, and




party of the second part,

**WITNESSETH,** that the party of the first part, in consideration of ten dollars and other valuable consideration paid by the party of the second part, does hereby grant and release unto the party of the second part, the heirs or successors and assigns of the party of the second part forever,

**ALL** that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the















TOGETHER with all right, title and interest, if any, of the party of the first part, in and to any streets and roads abutting the above-described premises to the center lines thereof; TOGETHER with the appurtenances and all the estate and rights of the party of the first part in and to said premises; TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.


AND the party of the first part covenants that the said premises is transferred free and clear of all liens, claims and encumbrances.


AND the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

**IN WITNESS WHEREOF,** the party of the first part has duly executed this deed the day and year first above written.


IN PRESENCE OF:

_____        _____



_____        _____

American LegalNet, Inc.
www.FormsWorkflow.com

**Acknowledgement taken in New York State**

State of New York, County of          , ss:

On the          day of          , in the year          , before me, the undersigned, personally appeared

personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s) or the person upon behalf of which the individual(s) acted, executed the instrument.

**Acknowledgement by Subscribing Witness taken in New York State**

State of New York, County of          , ss:

On the          day of          , in the year          , before me, the undersigned, personally appeared

the subscribing witness to the foregoing instrument, with whom I am personally acquainted, who being by me duly sworn, did depose and say, that he/she/they reside(s) in

that he/she/they know(s)

to be the individual described in and who executed the foregoing instrument; that said subscribing witness was present and saw said

execute the same; and that said witness at the same time subscribed his/her/their name(s) as a witness thereto.

Title No.:_____

TO

**Acknowledgement taken in New York State**

State of New York, County of          , ss:

On the          day of          , in the year          , before me, the undersigned, personally appeared

personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s) or the person upon behalf of which the individual(s) acted, executed the instrument.

**Acknowledgement taken outside New York State**

*State of          , County of,          ss:
*(or insert District of Columbia, Territory, Possession or Foreign Country)

On the          day of          , in the year          , before me, the undersigned, personally appeared

personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s) or the person upon behalf of which the individual(s) acted, executed the instrument, and that such individual made such appearance before the undersigned in the

(add the city or political subdivision and the sate or country or other place the acknowledgement was taken).

BLOCK

LOT

COUNTY OR TOWN

**RETURN BY MAIL TO:**

**Zip No.**

SECTION

RESERVE THIS SPACE FOR USE OF RECORDING OFFICE

American LegalNet, Inc.
www.FormsWorkflow.com